# COURT OF APPEALS
## DECISION
## DATED AND FILED

## March 5, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP948-CR**

Cir. Ct. No. **2014CF2410**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MARQUIS HUDSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: M. JOSEPH DONALD and JANET C. PROTASIEWICZ, Judges. *Affirmed*.

Before White, C.J., Geenen and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Marquis Hudson was convicted by a jury of second-degree reckless homicide as a party to a crime (PTAC). The jury also acquitted Hudson on the charges of attempted armed robbery and being a felon in possession of a firearm. Hudson argues on appeal that: (1) there was insufficient evidence to support the jury's verdict convicting him of second-degree reckless homicide (PTAC); (2) his trial counsel was ineffective due to a conflict of interest, for failing to pursue certain defenses and jury instructions, and for not eliciting certain impeaching testimony; (3) the State committed a *Brady*[1] violation by not disclosing material impeaching evidence; and (4) the trial court erroneously exercised its discretion at sentencing.

¶2      We reject Hudson's arguments and affirm his judgment of conviction and the order denying his motion for postconviction relief.

## BACKGROUND

¶3      On the morning of June 2, 2014, Milwaukee police found M.Z.[2] lying facedown in the grass near a sidewalk with several gunshot wounds, including one in his back. M.Z. later died from those wounds. Hudson was identified as a suspect after a witness who lived near the crime scene told police that the shooter got into a gray Cadillac. The witness provided a partial license plate number for the Cadillac, which was linked to Hudson. Hudson and his co-

---

[1]  *Brady v. Maryland*, 373 U.S. 83 (1963).

[2]  Initials are used to refer to the victim in this case "to better protect the privacy and dignity interest of crime victims." WIS. STAT. RULE 809.86(1) (2021-22).

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

actor, his brother Anthony Woods, were further identified through a security video. In an amended information, the State charged Hudson with first-degree reckless homicide (PTAC), attempted armed robbery with the use of force (PTAC), and possession of a firearm by a felon. The case proceeded to a jury trial.

¶4      Several witnesses testified at a multi-day trial. The evidence established that police found M.Z. lying facedown outside his residence with several gunshot wounds, including one in his back, and that those gunshot wounds caused M.Z.'s death. A Ruger .45 caliber handgun was located underneath M.Z.'s body, in his right hand. A .45 caliber shell casing as well as two 9mm Winchester shell casings were discovered at the scene.

¶5      Two witnesses, D.J. and T.H., testified that they heard gunshots outside their homes, observed the shooting scene, and saw the shooter flee. D.J. testified that he saw M.Z. running from the back of his yard to the front while being chased by a man with a gun who was shooting at M.Z. The shooter caught up to M.Z. and fired again, hitting M.Z., before entering a silver SUV and speeding away.[3] T.H., who admitted that he did not want to testify at trial, stated that on the day of the shooting, he told police that he heard five or six gunshots and then saw two men get into a gray Cadillac SUV and speed off. T.H. told the police that the vehicle's license plate number was either 676WFJ or 676WJF.

---

[3] A police officer testified that on the day of the shooting, D.J. told police that he came outside and saw that M.Z. was already lying facedown; he did not say he saw someone shoot M.Z., and he could not tell whether the shooter got into the SUV or not.

¶6      Police officers testified that, with the partial license plate number T.H. provided, they identified a gray Cadillac SUV with license plate number 676WEJ, registered to Tomika Woods Hudson.  T.H. identified the vehicle as the one used in the shooting.  Police found the vehicle parked outside the home of D.G., Hudson's girlfriend, on 27th Street in Milwaukee.  After D.G. consented to a search of the home, police found two speeding tickets issued to Hudson.  The vehicle was towed from the scene for processing.  No fingerprints were recovered from the vehicle itself; however, a fingerprint belonging to Hudson was found on a tin can on the vehicle's passenger seat.

¶7      One police officer explained that, as a part of the investigation, he recovered and reviewed security footage from several locations that appeared to show Hudson, Anthony and Raymond Woods,[4] and the Cadillac on the day of the homicide.  Based on the footage, the officer testified about Hudson's, Anthony's, and the Cadillac's movements throughout the day of the shooting.  Notably, security footage captured Anthony and Raymond cleaning the SUV after the shooting but before the vehicle was towed for processing, with Raymond wiping down all the doors with a cloth and Anthony throwing several items into a garbage can.

¶8      Anthony testified that Hudson lived with D.G. at the 27th Street home and that the Cadillac was owned by either Hudson or Anthony's sister, but Hudson generally drove it.  Anthony confirmed that he was with Hudson on the day of the homicide.  According to Anthony, he, Hudson, and a third person

---

[4] This opinion refers to Anthony Woods and Raymond Woods by their first names to avoid confusion.  Raymond is Hudson's and Anthony's uncle.

Anthony knew as "Little Cuz" discussed that M.Z. owed a drug debt. Hudson said that he planned to take from M.Z. the money he was owed, and that if M.Z. did not have the money, Hudson would take drugs he believed M.Z. stored in the garage. The three then left in the Cadillac and drove to M.Z.'s.

¶9 Anthony testified that when Hudson confronted M.Z., M.Z. pulled a gun and that Hudson pulled his gun only in response. Anthony heard gunshots and ran to the car. Anthony then saw Hudson running back to the car with a gun in his hand and they drove away. After the shooting, Anthony helped Raymond clean out the car because Raymond did not want any fingerprints to be left behind.

¶10 Hudson challenged Anthony's credibility at trial. Anthony admitted that he pleaded guilty to attempted robbery for his role in the homicide and that in exchange for his truthful testimony, the State would "leave prison and the length to be determined by the [c]ourt[.]" He also admitted that he initially denied being present at the crime scene but later admitted to police that he was there. Hudson's trial counsel further pointed out that Anthony made several prior inconsistent statements to police, including statements that he both was and was not aware that he was going along with Hudson to help commit a robbery, that Hudson, not M.Z., pulled a gun first, and that Hudson, not Raymond, suggested wiping down the Cadillac.

¶11 During his testimony, Raymond corroborated Hudson's address and relationship to the Cadillac and identified the people in the security footage as Hudson and Anthony. Raymond further testified that, on the day of the homicide, Anthony and Hudson left to "make a run," and that when Anthony returned, he said "someone was trippin" and "somebody had pulled out a pistol and shots just got going off." Raymond also testified that, as a result of Anthony's statement, he

and Anthony cleaned the Cadillac to remove fingerprints or other evidence. During his testimony, Raymond admitted that he was charged in connection with his role in M.Z.'s shooting and that he ultimately pleaded guilty to harboring a felon for his role, in exchange for a State recommendation at sentencing of probation with an imposed but stayed prison sentence if he testified truthfully against his co-actors.

¶12    The jury found Hudson guilty of second-degree reckless homicide (PTAC) with use of a dangerous weapon, not guilty of attempted armed robbery (PTAC), and not guilty of possession of a firearm by a felon. At sentencing, the circuit court[5] explained that due to the seriousness of the offense, Hudson's character, and the need for retribution, a prison sentence was necessary. The circuit court sentenced Hudson to sixteen years of initial confinement and ten years of extended supervision, four years fewer than the maximum sentence.

¶13    Hudson filed a postconviction motion arguing that: (1) there was insufficient evidence to support the jury's conviction; (2) his trial counsel was ineffective; (3) the State committed a *Brady* violation; and (4) the circuit court erroneously exercised its discretion at sentencing. The postconviction court denied Hudson's motion without a hearing. It concluded that the evidence was sufficient to sustain Hudson's conviction, that Hudson's ineffective assistance allegations were conclusory and therefore failed, that the *Brady* claim failed because the evidence was disclosed and because any undisclosed evidence was not

---

[5] The Honorable M. Joseph Donald presided over the proceedings in this case and imposed sentence; we refer to him as the circuit court. The Honorable Janet C. Protasiewicz decided Hudson's postconviction motion; we refer to her as the postconviction court.

material, and that the sentencing court did not erroneously exercise its discretion. Hudson now appeals.

## DISCUSSION

### I. The evidence at trial was sufficient to support the jury's verdict convicting Hudson of second-degree reckless homicide (PTAC).

¶14 Hudson argues that the trial evidence was insufficient to support the jury's conviction on the charge of second-degree reckless homicide (PTAC). Hudson's claim relies primarily on the fact that Anthony was the only witness to identify him as the shooter, and that Anthony was not credible because he provided several inconsistent statements to police and was motivated by his own plea deal. He also contends that the jury's acquittal on the felon in possession of a firearm charge is inconsistent with the jury's conviction on second-degree reckless homicide (PTAC).

¶15 When a defendant challenges the sufficiency of the evidence supporting a jury's verdict, we "may not substitute [our] judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). "This high standard translates into a substantial burden for a defendant seeking to have a jury's verdict set aside on grounds of insufficient evidence." *State v. Hanson*, 2012 WI 4, ¶31, 338 Wis. 2d 243, 808 N.W.2d 390. "Once the jury accepts the theory of guilt, an appellate court need only decide whether the evidence supporting that theory is sufficient to sustain the verdict. *State v. Mertes*, 2008 WI App 179, ¶11, 315 Wis. 2d 756, 762 N.W.2d 813.

¶16 Hudson's argument with respect to identification is, essentially, that the jury should not have found Anthony credible, and that no one else identified him as the shooter. However, the jury is the ultimate arbiter of fact and credibility, and we may not substitute our judgment for that of the trier of fact. *Poellinger* 153 Wis. 2d at 507. The postconviction court summarized the evidence supporting Hudson's conviction:

> The [j]ury heard from three scene witnesses, that while unable to identify any of the suspects, clearly established that the two suspects had run from the scene and gotten into a gray Cadillac SUV. One witness obtained a partial plate, off by only one letter. That investigation led to the [d]efendant's Cadillac, which was identified by the eyewitness as the vehicle that took the two suspects from the scene. Upon locating the vehicle at the [d]efendant's house, with fingerprint evidence connecting the vehicle to the [d]efendant, police also located video footage that showed the [d]efendant driving this suspect vehicle prior to the homicide and having his family attempt to clean the car of evidence after the homicide. His brother, Anthony, admitted to being a part of the incident as the other individual along with the [d]efendant that committed the attempted armed robbery and then ran to the car. He testified that the defendant shot the victim during an attempt to collect money and that he and the [d]efendant then ran to the car. Raymond testified that Anthony told him that the [d]efendant shot, and thus the two of them cleaned the car to remove evidence. Lastly, months after his family was arrested and charged, the [d]efendant fled from police in an attempt to avoid being caught by police.[6]

Based on this evidence, a reasonable jury could have found guilt beyond a reasonable doubt.

---

[6] Several months after the homicide, Hudson was pulled over in Lake Mills for an illegal U-turn. Hudson provided a fake name which came back with a paternity warrant, so the officer tried to arrest Hudson. Hudson pushed the officer away, got into his car, and sped off at over 100 miles per hour. He was eventually stopped by a different officer, his true identity was discovered, and Hudson was arrested.

¶17 Hudson also argues that the jury's conviction on the second-degree reckless homicide (PTAC) charge is inconsistent with its acquittal on the charge of felon in possession of a firearm. Even if these verdicts are inconsistent with one another—and we are not convinced that they are given that second-degree reckless homicide was charged as a party to a crime—they do not need to be logically consistent. In *United States v. Powell*, 469 U.S. 57, 65 (1984), the Supreme Court explained:

> [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the [State] at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity arrived at an inconsistent conclusion on the lesser offense….
>
> Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the [State] is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course.

*See also State v. Rice*, 2008 WI App 10, ¶¶25-27, 307 Wis. 2d 335, 743 N.W.2d 517 (discussing and quoting *Powell*). Accordingly, we conclude there was sufficient evidence to support the jury's verdict convicting Hudson of second-degree reckless homicide (PTAC).

## II. Hudson was not denied effective assistance of counsel.

¶18 Hudson argues that his trial counsel was constitutionally ineffective in several ways, including due to a conflict of interest. As discussed below, we reject Hudson's arguments.

¶19 "Ineffective assistance of counsel claims present mixed questions of fact and law." *State v. Reinwand*, 2019 WI 25, ¶18, 385 Wis. 2d 700, 924 N.W.2d 184 (internal quotation and citation omitted). The circuit court's findings of fact are upheld "unless they are clearly erroneous." *Id.* "However, whether counsel's performance was deficient and whether a defendant was prejudiced [by that deficient performance]" are questions of law that we review independently. *Id.*

¶20 A defendant claiming ineffective assistance of counsel must prove both that counsel's performance was deficient and that he or she suffered prejudice as a result of that deficient performance. *Id.* at ¶¶40, 42. However, we need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

¶21 In arguing that counsel was ineffective during trial, Hudson contends that (1) trial counsel should have argued self-defense and asked for an instruction on self-defense; (2) trial counsel should have requested a jury instruction for when identification of the defendant was in issue; and (3) trial counsel should have elicited testimony from Anthony and Raymond to highlight their credibility issues. However, Hudson does not explain in any meaningful detail how these alleged deficiencies resulted in prejudice. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Instead, Hudson states in conclusory fashion that trial counsel's alleged deficiencies caused prejudice. In this respect, Hudson failed to "allege sufficient material and non-conclusory facts that, if true, would entitle him

to relief," and accordingly, is not entitled to a ***Machner*** hearing.[7]  ***State v. Jackson***, 2023 WI 3, ¶11, 405 Wis. 2d 458, 983 N.W.2d 608.

¶22  Moreover, Hudson's defense was that he was not at the scene of the crime and that the evidence suggested that the victim was chased and shot in the back.  In the absence of evidence that supports a self-defense theory and a defense that Hudson was not there, and overwhelming evidence of guilt, trial counsel's decision not to pursue a contradictory self-defense argument and instruction did not cause prejudice.

¶23  Hudson cannot establish prejudice from the failure to request and obtain a jury instruction on identification under the circumstances.  WIS JI—CRIMINAL 141, titled "Where Identification of Defendant is in Issue," describes what kinds of evidence, such as length of observation, how close the witness was, the lighting, etc., a jury should use to determine whether the person a witness observed was truly the defendant.  The only witness to identify Hudson as the shooter was Anthony, Hudson's brother, who undoubtedly knew who Hudson was and faced no impediments in identifying the shooter.  The instruction would have been inappropriate under the circumstances, and there cannot be prejudice stemming from the failure to give an inappropriate and unnecessary instruction.

¶24  Hudson also argues that trial counsel should have elicited testimony from Anthony and Raymond to highlight their credibility issues, but offers no explanation as to why these prior inconsistent statements undermine confidence in the outcome of the trial, particularly where the jury already knew that Anthony

---

[7] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App 1979)

had mental health issues and that both Anthony and Raymond gave prior inconsistent statements. The failure to allege prejudice prevents a finding that counsel was ineffective.

¶25 In sum, and in light of the overwhelming evidence against him, we conclude that the record conclusively establishes that counsel's alleged deficient performance at trial did not prejudice Hudson.

¶26 Finally, Hudson argues that his trial counsel's performance was deficient due to a conflict of interest. A defendant who alleges ineffective assistance based on a conflict of interest "must establish by clear and convincing evidence that an actual conflict of interest existed." *State v. Love*, 227 Wis. 2d 60, 69, 594 N.W.2d 806 (1999). "It is not sufficient that he show that 'a mere possibility or suspicion of a conflict could arise under hypothetical circumstances.'" *Id.* at 69-70 (citation omitted). If the defendant makes this showing, prejudice is presumed. *Id.* at 70.

¶27 Hudson's conflict of interest claim is based on a fax that his trial counsel sent to an attorney representing Hudson's uncle, Joe White, in a separate civil action. The fax states that White agreed to pay outstanding legal fees for Hudson "and two other family members who are involved in the same incident." Hudson argues that the fax implies that his trial counsel also represented his co-actors, creating an actual conflict. This argument cannot withstand scrutiny. The record establishes that throughout this criminal case, Hudson, Raymond, and Anthony were represented by separate independent counsel. We conclude the fax falls short of showing or even alleging an actual conflict by clear and convincing evidence. With respect to this argument, Hudson did not allege sufficient material

and non-conclusory facts that would entitle him to relief, and he was therefore not entitled to a *Machner* hearing.  *Jackson*, 405 Wis. 2d 458, ¶11.

### III.  The State did not commit a *Brady* violation.

¶28  Hudson next contends that the State committed a *Brady* violation by failing to produce a report containing a prior false statement Raymond gave to police.  We disagree.

¶29  A defendant "has a constitutional right to material exculpatory evidence in the hands of the prosecutor[,]" *State v. DelReal*, 225 Wis. 2d 565, 570, 593 N.W.2d 461 (Ct. App. 1999), and failure to disclose such evidence violates a defendant's due process rights, *Brady v. Maryland*, 373 U.S. 83, 86 (1963).  "A *Brady* violation has three components:  (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material."  *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.  "Evidence is not material under *Brady* unless the nondisclosure 'was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'"  *Id.*, ¶36 (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).  We independently review whether a *Brady* violation occurred but accept the circuit court's findings of fact unless clearly erroneous.  *Id.*, ¶35.

¶30  We conclude that the report itself and any of its details are not material.  The substance of the report, i.e., Raymond's prior false statement, was already produced.  Additionally, Hudson again fails to allege or explain how the report and its details "would have produced a different verdict[,]" especially given the fact that Raymond's credibility issues were fully fleshed out at trial and the

evidence of Hudson's guilt was strong. Accordingly, we conclude that the State did not commit a **Brady** violation.[8]

## IV. The circuit court did not erroneously exercise its discretion at sentencing.

¶31 Hudson argues that the court erroneously exercised its discretion at sentencing because it did not consider the required sentencing factors. The argument is not well developed, but to the extent it is, we consider the argument and reject it.

¶32 A circuit court must state the reasons for its sentencing decision on the record. WIS. STAT. § 973.017(10m); **State v. Gallion**, 2004 WI 42, ¶5, 270 Wis. 2d 535, 678 N.W.2d 197. In fashioning its sentence, the circuit court "must consider the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant, as well as any appropriate mitigating or aggravating factors." **State v. Salas Gayton**, 2016 WI 58, ¶22, 370 Wis. 2d 264, 882 N.W.2d 459. "The weight given each of these factors lies within the [circuit] court's discretion, and the court may base the sentence on any or all of them." **State v. Odom**, 2006 WI App 145, ¶7, 294 Wis. 2d 844, 720 N.W.2d 695. We review a circuit court's sentencing decision under the erroneous exercise of

---

[8] Though we decide the **Brady** claim based on Hudson's failure to adequately allege and demonstrate materiality, the claim lacks merit for other reasons. For example, Hudson's argument is so poorly developed that we need not address it at all. **Bence v. Spinato**, 196 Wis. 2d 398, 414 n.4, 538 N.W.2d 614 (Ct. App. 1995) ("This court generally will not decide issues that are undeveloped or inadequately briefed."). Hudson also fails to address the postconviction court's reasons for ruling that the State had not committed a **Brady** violation, namely, that the substance of Raymond's prior false statement was produced, and in any event, the report itself and any undisclosed details were not material. "Failure to address the grounds on which the circuit court ruled constitutes a concession of the ruling's validity." **Sands v. Menard**, 2016 WI App 76, ¶52, 372 Wis. 2d 126, 887 N.W.2d 94.

discretion standard. *State v. Villamil*, 2017 WI 74, ¶23, 377 Wis. 2d 1, 898 N.W.2d 482.

¶33 In the instant case, the circuit court considered the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. It explained that Hudson was "truly dangerous" and that "society need[ed] a break from [him.]" It stated that "this is a serious offense" due largely to the death of the victim and its impact on the victim's family. Finally, the circuit court considered the need for imprisonment in light of Hudson's character, including his flight attempts, his attempts to mislead and deceive with respect to the offense, and that Hudson refused to answer the presentence investigation reporter's questions. We are satisfied that the circuit court properly considered the required sentencing factors and adequately stated the reasons for its sentencing decision.

¶34 Hudson also argues that the circuit court should have considered his acquittal and other non-descript attributes he characterizes as "positives." However, the circuit court is not required to discuss either of these things. Although WIS. STAT. § 973.017(2)(b) requires circuit courts to consider any "applicable" mitigating factors, it remains within the discretion of the circuit court to decide which mitigating factors, if any, are "applicable," and the circuit court is required "to discuss only those factors it believes are relevant." *State v. Grady*, 2007 WI 81, ¶41, 302 Wis. 2d 80, 734 N.W.2d 364. Accordingly, we conclude that the circuit court did not erroneously exercise its discretion at sentencing.

¶35 In sum, we conclude: (1) there was sufficient evidence to support the jury's verdict convicting Hudson of second-degree reckless homicide (PTAC); (2) Hudson's trial counsel was not ineffective due to a conflict of interest, for failing to pursue certain defenses and jury instructions, nor for failing to elicit

15

certain impeaching testimony; (3) the State did not commit a ***Brady*** violation; and (4) the trial court did not erroneously exercise its discretion at sentencing.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.